UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
SOLUTIONS EXPRESS LTD. d/b/a SOLEX and
TECHNOLOGY OPPORTUNITY GROUP, LTD.,

                            Plaintiffs,                    **OPINION & ORDER**

   - against -                            No. 20-CV-7843 (CS)

ASHLEY FURNITURE INDUSTRIES, INC.,

                            Defendant.
--------------------------------------------------------------x

Appearances:
Timothy J. Fierst
The Fierst Law Group, P.C.
East Williston, New York
*Counsel for Plaintiffs*

Matthew J. Schenker
Fox Rothschild LLP
New York, New York
*Counsel for Defendant*

Seibel, J.

Before the Court is the motion for summary judgment of Defendant Ashley Furniture

Industries, Inc. ("Ashley" or "Defendant"), (ECF No. 47), and the cross-motion for summary

judgment of Plaintiffs Solutions Express Ltd. d/b/a Solex ("Solex") and Technology Opportunity

Group, Ltd. ("TOG"), (collectively, "Plaintiffs"), (ECF No. 52). For the following reasons,

Defendant's motion is GRANTED, and Plaintiffs' cross-motion is DENIED.

I.      **BACKGROUND**

      A.      **Facts**

The following facts are based on the parties' Local Civil Rule ("LR") 56.1 Statements,

(ECF No. 50 ("D's 56.1 Stmt."); ECF No. 53 ("Ps' 56.1 Stmt."), ECF No. 54 ("Ps' 56.1 Resp.");

ECF No. 51-1 ("D's 56.1 Resp.")), and the evidentiary materials submitted by the parties, and

are undisputed unless otherwise noted.[1]

In March 2015, Defendant and non-party BCN Telecom Inc. ("BCN") entered into a term

agreement (the "Term Agreement"), under which BCN became Defendant's agent for purposes

of acquiring telecommunications services.  (D's 56.1 Stmt. ¶ 1; Ps' 56.1 Stmt. ¶ 1.)  In doing so,

BCN would act as a "reseller," meaning that although BCN was the carrier of record, services

were actually provided by other carriers, including Verizon.  (*See* ECF No. 49-18 ("Kean

Depo.") at 22:12-22; 25:5-10.)  Accordingly, the outside carrier would bill BCN directly and

BCN would bill the customer.  (ECF No. 49-19 ("McCrosson Depo. 1") at 107:18-108:2.)

From at least 2012 through 2016, TOG acted as a "master agent" of BCN, generating

sales for BCN and performing billing services for BCN accounts.  (*See id.* at 65:3-6; Kean Depo.

---

[1] Plaintiffs failed to comply with LR 56.1 in their response to Defendant's 56.1
Statement.  LR 56.1 requires the party opposing summary judgment to include "correspondingly
numbered paragraph[s] responding to each numbered paragraph in the statement of the moving
party," LR 56.1(b), and to support each such paragraph with "citation to evidence that would be
admissible," *id.* 56.1(d).  It further provides that if the non-moving party fails to specifically
controvert a statement of the moving party, that statement is deemed admitted.  *Id.* 56.1(c).
Plaintiffs' responses consisted of a single numbered paragraph, responding to only one of
Defendant's statements.  (*See* Ps' 56.1 Resp.)  It may be that Plaintiffs proceeded in this fashion
because they admit the remaining statements.  (*See* ECF No. 58 ("Ps' Reply") at 2 n.2.)  In any
event, Plaintiffs' failure to respond individually to Defendant's statements permits me to
consider those statements admitted for purposes of Defendant's motion, provided Defendant's
statements are properly supported by evidence.  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74
(2d Cir. 2001).  But that would not necessarily mean Defendant is entitled to summary judgment.
"If the evidence submitted in support of the summary judgment motion does not meet the
movant's burden of production, then summary judgment must be denied *even if no opposing
evidentiary matter is presented.*"  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244
(2d Cir. 2004) (emphasis in original).  Additionally, both parties' responsive 56.1 Statements fail
to comply with item 2.C.i of my Individual Practices, which requires the opposing party to
reproduce each entry in the moving party's LR 56.1 Statement before setting out its response
thereto.  Because Defendant provided substantive responses, its failure to reproduce the opposing
party's 56.1 statements defeats the purpose of my individual practice, which is designed to
obviate the need to go back and forth between the two statements.

at 20:3-13; D's 56.1 Stmt. ¶¶ 3-4; *see also* ECF No. 49-6 (memorializing TOG's agency relationship with NUI Telecom, BCN's predecessor).) Solex was technically a separate entity that TOG used to promote telecommunication services, (Kean Depo. at 27:5-7), but according to John Kean, Jr., executive advisor of BCN, there was no difference between Solex and TOG in terms of the role that they performed for BCN's customers, (*id.* at 30:21-31:3). Neither TOG nor Solex had any role in paying the outside carrier such as Verizon for services that were passed through BCN. (McCrosson Depo. 1 at 113:20-25.) And neither Solex nor TOG provided the underlying telecommunications services to Defendant. (D's 56.1 Stmt. ¶ 6; McCrosson Depo. 1 at 84:20-85:12.)

Both Solex and TOG are owned by Thomas J. McCrosson, Sr., (D's 56.1 Stmt. ¶ 7), who also served as a director of BCN from 2011 to 2016 and was one of its largest shareholders, (McCrosson Depo. 1 at 65:19-23, 72:8-25). As part of his role at TOG, McCrosson would bring customers to BCN, one of which was Defendant. (*Id.* at 77:11-19 (testifying that his relationship with Defendant dates back almost 20 years); Kean Depo. at 85:4-20 (testifying that because of McCrosson's longstanding relationship with Defendant, Defendant was referred to as TOG's "customer").)

In October 2016, Defendant's phone lines were hacked by a foreign third party. (D's 56.1 Stmt. ¶ 8.) The fraudulently used telecommunication services were provided by Verizon, (*id.* ¶ 9), and resulted in a charge of $126,433.89 from Verizon to BCN and a charge of the same amount from BCN to Defendant, (*id.* ¶¶ 10, 11; Ps' 56.1 Stmt. ¶¶ 5, 6).[2] The Term Agreement

---

[2] With the exception of their LR 56.1 Statements, the parties are inconsistent on the amount that Defendant was charged for the fraudulent services. In the Complaint, Plaintiffs alleged that Defendant owed $273,961.12 for the services. (ECF No. 1 ("Compl.") ¶¶ 16, 23, 28.) In the Amended Complaint ("AC"), Plaintiffs allege that "Solex independently credited

includes a provision entitled "Responsibility for Usage and Fraud," which provides that

Defendant

> shall be solely and exclusively responsible for the use and control of access to its
> telephone lines and for all usage attributable to [its] telephone lines including
> unauthorized or fraudulent usage.  Customer shall not be relieved from its
> obligation to make timely and full payment hereunder as a result of fraudulent
> usage of the service.

(ECF No. 49-5 ¶ 5.)  Nevertheless, Defendant disputed these charges with BCN.  (D's 56.1 Stmt.

¶ 12.)  BCN ultimately paid Verizon $66,433.89 for the fraudulent services and utilized a credit

to satisfy the remaining balance.  (*Id.* ¶ 13.)  In other words, BCN paid Verizon in full.

On or about November 18, 2016, Plaintiffs entered into an asset purchase agreement (the

"TOG APA") with Network Billing Systems, LLC d/b/a Fusion ("Fusion"), (*id.* ¶ 14; *see* ECF

No. 49-9 ("TOG APA")), a telecommunications provider that specialized in cloud technology,

(McCrosson Depo. 1 at 119:12-21).  Under the TOG APA, Fusion purchased certain customer

contracts from Plaintiffs, (D's 56.1 Stmt. ¶ 14), as part of McCrosson's effort to move his

customers to Fusion and cut ties with BCN, (*see* McCrosson Depo. 1 at 121:8-123:3).

As of March 1, 2017, via an Asset Purchase and Transition Services Agreement, (ECF

No. 49-10 (the "BCN APA")), BCN sold to Fusion the accounts receivable of certain customers

– including Defendant's receivable, which sold for $126,372.88 – as well as the right to service

those customers.  (D's 56.1 Stmt. ¶ 15; *see* Kean Depo. at 69:6-12.)  According to Kean, Fusion

purchased Defendant's account receivable because he was under the impression there was an

---

Ashley with $30,000 off of its account receivable, leaving a balance due of $126,372.88," (ECF
No. 29 ("AC") ¶ 26), suggesting the total billed was $156,372.88.  In both Defendant's and
Plaintiffs' briefs, they state that the amount charged by Verizon to BCN and BCN to Ashley was
$126,231.24.  (ECF No. 50 ("D's Mem.") at 2; ECF No. 57 ("Ps' Mem.") at 1.)  Because the
parties agree as to $126,433.89 in their 56.1 Statements, I use that figure.

"intended resolution," including that Verizon would credit part of the payment and that Ashley was willing to pay roughly $86,000 or $87,000 of the amount due.  (Kean Depo. at 84:8-23.)

On or about March 24, 2017, as a condition of the BCN APA, Plaintiffs and Fusion executed a Guaranty Agreement (the "Guaranty") under which, if a receivable sold pursuant to the BCN APA was not paid within 120 days, Plaintiffs would:  (1) guarantee payment of the receivable minus 1% of the discounted amount at which Fusion purchased it; and (2) permit Fusion to off-set the outstanding payment against the amount Fusion owed to Plaintiffs.  (ECF No. 49-11 ("WHEREAS, as an inducement to Fusion entering into the [BCN] APA with BCN, the [Plaintiffs] willing to jointly and severally guarantee the payment of the Accounts Receivable (minus 1% of the discounted amount at which they are purchased by Fusion from BCN) and to grant Fusion a right of set-off against any and all amounts owed by Fusion to the [Plaintiffs] under the terms of the Payment Formula as set forth herein"); *id.* ¶ 7 ("The [Plaintiffs] hereby agree that Fusion shall be entitled to set-off any amount that Fusion owes to the [Plaintiffs] under the Payment Formula against any and all Accounts Receivable that have not been paid prior to the expiration of one hundred and twenty days (120) days following the Execution Date"); *see* D's 56.1 Stmt. ¶ 16; Ps' 56.1 Stmt. ¶ 15.)  The Guaranty further provides that if "Fusion receives payment of any Account Receivable the required amount of which has been set-off hereunder from the underlying customer or any third party other than the [Plaintiffs], Fusion agrees to reimburse [Plaintiffs] for such amount, *minus* any cost of collection incurred by Fusion that had been pre-approved by [Plaintiffs]."  (ECF No. 49-11 ¶ 7 (emphasis in original).)  The Guaranty further provides that so long as the BCN APA has not been terminated, and so long as the Guaranty is still enforceable, the "McCrosson Team," as defined in the TOG APA, "shall be permitted to control, manage and take all lawful measures to collect the Accounts Receivable

5

from the customers for Fusion." (*Id.* ¶ 5.)  Fusion undertook to use its "best efforts to support

and assist the McCrosson Team in their collection efforts." (*Id.*)  For purposes of the Guaranty,

Plaintiffs waived any right of "subrogation, reimbursement, indemnification, contribution,

substitution, or any similar right the [Plaintiffs] may have any against Person." (*Id.* ¶ 4(a).)[3]  In

short, under the Guaranty, if any of the receivables covered by the Guaranty remained unpaid

after 120 days, Plaintiffs in effect would pay Fusion almost the full amount of the receivable;

Fusion would have to reimburse Plaintiffs if it later collected the receivable; and as long as the

BCN APA and the Guaranty were still in effect, Plaintiffs could try to collect the receivable for

Fusion.

On May 15, 2017, BCN and Solex sent Defendant a "Notice of Carrier Change," stating

that Fusion had "acquire[d] certain assets and accounts of BCN that have historically been

supported by [TOG] and [Solex]." (ECF No. 55 at 4.)[4]  Although the notice indicates that "Solex

will automatically become your telecommunications provider upon final close and regulatory

approval on or after May 15, 2017," the reference to "Solex" apparently refers to Fusion doing

business as Solex. (*See* Kean Depo. at 100:18-101:3.)[5]

According to McCrosson, pursuant to the Guaranty, Fusion has withheld funds from his

commissions due to Defendant's failure to pay its receivable. (*See* ECF No. 49-20 ("McCrosson

---

[3] "Person" is defined in the Guaranty to mean "an individual, corporation, limited liability company, partnership, trust, association, joint venture, unincorporated organization or entity of any kind or nature, or a governmental authority." (ECF No. 49-11 ¶ 2.)

[4] Citations to the ECF No. 55 refer to page numbers set by the Court's Electronic Case Filing ("ECF") system.

[5] In 2018, McCrosson was an employee of Fusion and operating Solex, which had become the distribution arm of Fusion. (ECF No. 49-21 ("Soldan Depo.") at 23:12-19.) Although McCrosson no longer works at Fusion, (*id.* at 32:8-12), his companies (although it is not clear which ones) continue to operate as an agent for Fusion, (*id.* at 32:25-33:8).

Depo. 2") at 154:13-156:2-10, 187:16-19; Ps' 56.1 Stmt. ¶ 16.)  Defendant disputes this claim,

pointing to the testimony of Keith Soldan, Fusion's Chief Financial Officer, in which he states

that he is not sure whether the withheld compensation is related to Defendant's debt.  (D's 56.1

Resp. ¶ 16 (citing Soldan Depo. at 56:4-11).)

On or about June 3, 2019, Fusion and affiliated debtors filed for Chapter 11 bankruptcy.

(D's 56.1 Stmt. ¶ 17; Ps' 56.1 Stmt. ¶ 18.)  Defendants state that both the TOG APA and the

Guaranty were rejected in bankruptcy, (D's 56.1 Stmt. ¶ 18), but Plaintiffs dispute that the

Guaranty was rejected, "as the Bankruptcy Court Order approving the rejection of certain

contracts only applies to 'executory' contracts, and the Guaranty does not qualify as

'executory,'" (Ps' 56.1 Resp. ¶ 18).  On or about November 7, 2019, Plaintiffs, McCrosson, and

Fusion entered into an additional agreement governing their relationship going forward, which

does not explicitly address the Guaranty or Defendant's receivable but does include Plaintiffs'

release of claims against Fusion.  (D's 56.1 Stmt. ¶ 19; *see* ECF No. 49-15.)

Both parties agree that Fusion maintains the disputed Ashley Furniture charges on its

books.  (D's 56.1 Stmt. ¶ 21; Ps' 56.1 Stmt. ¶ 21.)

**B.**     **Procedural History**

Plaintiffs brought the original complaint in this action on September 23, 2020, (Compl.),

and Defendant answered on November 17, 2020, (ECF No. 8).  In the original complaint,

"Solutions Express d/b/a Solex as assignee of BCN Telecom, Inc." brought breach of contract,

unjust enrichment, and quantum meruit claims against Defendant, under the theory that BCN

"assigned and transferred its right and obligations to provide the telecommunication services

which it provided to [Defendant] to the Plaintiff, SOLEX."  (Compl. ¶ 9.)

On August 27, 2021, after the discovery period, the Court granted Plaintiffs' request to amend the complaint. (ECF No. 28.) Plaintiffs filed their Amended Complaint on September 3, 2021, replacing the original plaintiff with Solex and TOG and alleging claims of unjust enrichment, quantum meruit, and equitable subrogation/implied contract to indemnify. (AC ¶¶ 29-46.) In the AC, Plaintiffs revised their theory of the case, arguing that Defendant had been unjustly enriched by receiving telecommunications services and paying neither BCN nor Plaintiffs for those services. (*Id.* ¶¶ 31-33.) Defendant filed its answer on September 10, 2021. (ECF No. 33.) Defendant moved for reconsideration of the Court's decision to let Plaintiffs amend their complaint, on the ground that Plaintiffs did not have good cause to amend. (ECF No. 31.) At the conference on October 5, 2021, the Court denied Defendants' motion for reconsideration and allowed some additional discovery. (*See* Minute Entry dated Oct. 5, 2021.) After an unsuccessful attempt at settlement, the instant motions were filed. (ECF Nos. 47-58.)

## II.   LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence

sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d

Cir. 2008).  "The mere existence of a scintilla of evidence in support of the [non-movant's]

position will be insufficient; there must be evidence on which the jury could reasonably find for

the [non-movant]." *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than

simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory

allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423,

428 (2d Cir. 2001).[6]

       "A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by . . . citing to particular parts of materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations . . .

admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1).  Where a

declaration is used to support or oppose the motion, it "must be made on personal knowledge, set

out facts that would be admissible in evidence, and show that the . . . declarant is competent to

testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino,*

*Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  In the event that "a party fails . . . to properly address

another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact

undisputed for purposes of the motion" or "grant summary judgment if the motion and

supporting materials – including the facts considered undisputed – show that the movant is

entitled to it." Fed. R. Civ. P. 56(e).

---

     [6] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

This same standard applies to cross-motions for summary judgment. *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001); *C & A Carbone, Inc. v. County of Rockland*, No. 08-CV-6459, 2014 WL 1202699, at *5 (S.D.N.Y. Mar. 24, 2014). Generally, in deciding cross-motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales*, 249 F.3d at 121; *see Chartis Seguros Mex., S.A. de C.V. v. HLI Rail & Rigging, LLC*, 3 F. Supp. 3d 171, 179 (S.D.N.Y. 2014). But where, as here, the motion and cross-motion seek a determination of the same issues, the Court can consider them together. *Chartis Seguros*, 3 F. Supp. 3d at 179; *Royal & Sun Alliance Ins., PLC v. E.C.M. Transp., Inc.* No. 14-CV-3770, 2015 WL 5098119, at *2 (S.D.N.Y. Aug. 31, 2015).

## III.   DISCUSSION

### A.   Choice of Law

The AC does not specify under which state's laws Plaintiffs' claims are brought. Defendant argues that New York law should apply, and Plaintiffs have not argued to the contrary (and, indeed, have applied New York law). (*See* D's Mem. at 5-6; Ps' Mem. at 5-12). Therefore, for purposes of both motions, the Court assumes that New York law governs. *See Dist. Att'y of N.Y. Cnty. v. Republic of the Phil.*, 307 F. Supp. 3d 171, 192 (S.D.N.Y. 2018) (parties assuming application of New York law constitutes implied consent, which is sufficient to establish choice of law).

### B.   Quasi-Contract Claims

Both parties move for summary judgment on Plaintiffs' unjust enrichment and quantum meruit claims. In the AC, Plaintiffs allege that Defendant has been unjustly enriched at Plaintiffs' expense because Defendant received telecommunication services without paying for

them, (AC ¶¶ 32, 38), and Plaintiffs are entitled to reimbursement for satisfying Defendant's

obligation to Fusion, (*id.* ¶¶ 33, 39).  Plaintiffs allege that they are entitled to $126,372.88, which

they assert is the remaining balance on Defendant's account receivable.  (*Id.* ¶ 26.)

Applying New York law, the Court "may analyze quantum meruit and unjust enrichment

together as a single quasi contract claim." *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v.

Fine Host Corp.*, 418 F.3d 168, 173 (2d Cir. 2005).  "To prevail on a claim of unjust enrichment,

a party must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it

is against equity and good conscience to permit the other party to retain what is sought to be

recovered." *Old Republic Nat'l Title Ins. Co. v. Luft*, 859 N.Y.S.2d 261, 262 (App. Div. 2008).

"A person may be unjustly enriched not only where he receives money or property, but also

where he otherwise receives a benefit.  He receives a benefit where his debt is satisfied or where

he is saved expense or loss." *Boyd v. J.E. Robert Co.*, No. 05-CV-2455, 2012 WL 4718823, at

*16 (E.D.N.Y. Aug. 27, 2012), *report and recommendation adopted*, 2012 WL 4718723

(E.D.N.Y. Oct. 2, 2012), *aff'd*, 765 F.3d 123 (2d Cir. 2014).

> In deciding whether equity and good conscience permit recovery, generally, courts will
> look to see if a benefit has been conferred on the defendant under mistake of fact or law,
> if the benefit still remains with the defendant, if there has been otherwise a change of
> position by the defendant, and whether the defendant's conduct was tortious or
> fraudulent.

*Lexon Ins. Co. v. Wells Fargo Bank, N.A.*, No. 13-CV-3407, 2014 WL 11353148, at *6

(S.D.N.Y. Aug. 20, 2014), *aff'd*, 619 F. App'x 27 (2d Cir. 2015).  Similarly, to recover in

quantum meruit, the plaintiff must show "(1) the performance of services in good faith, (2) the

acceptance of the services by the person to whom they are rendered, (3) an expectation of

compensation therefor, and (4) the reasonable value of the services." *Revson v. Cinque &

Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir. 2000).

11

Defendant first argues that Plaintiffs' quasi-contract claims are precluded by the existence of the Term Agreement. (D's Mem. at 6-7; ECF No. 51 ("D's Reply") at 2-3.) In opposition, Plaintiffs contend that the Term Agreement does not preclude their claims because Plaintiffs are not parties to the Term Agreement and the Term Agreement is not the subject of the dispute. (Ps' Mem. at 4-5; ECF No. 58 ("Ps' Reply") at 2-3.)

New York law precludes recovery for claims of unjust enrichment and quantum meruit where there is a valid, enforceable contract governing the same subject matter. *See Mid-Hudson Catskill Rural Migrant Ministry, Inc*, 418 F.3d at 175 (2d Cir. 2005) ("New York law does not permit recovery in quantum meruit, however, if the parties have a valid, enforceable contract that governs the same subject matter as the quantum meruit claim."); *Valley Juice Ltd., Inc. v. Evian Waters of Fr., Inc.*, 87 F.3d 604, 610 (2d Cir.1996) ("Under New York law, the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."); *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 202 (S.D.N.Y. 2011) ("Unjust enrichment is a quasi-contractual claim that ordinarily can be maintained only in the absence of a valid, enforceable contract."); *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."). This principle applies even where the plaintiff or defendant is not a party to the contract. *See Viable Mktg. Corp. v. Intermark Commc'ns, Inc.*, No. 09-CV-1500, 2011 WL 3841417, at *3 (E.D.N.Y. Aug. 26, 2011) (unjust enrichment claim precluded by contract even where plaintiff was not party to contract); *Tchrs. Ins. & Annuity Ass'n of Am. v. CRIIMI MAE Servs. Ltd. P'ship*, 681 F. Supp. 2d 501, 511 (S.D.N.Y. 2010) (unjust enrichment claim

precluded by contract even where defendant was not party to contract), *aff'd*, 481 F. App'x 686 (2d Cir. 2012).

Here, Plaintiffs' quasi-contract claims are based on the theory that Defendant has been unjustly enriched through receipt of telecommunication services without settlement of the outstanding balance on its account. (*See* AC ¶¶ 31-33, 37-39.)  Accordingly, the subject matter of Plaintiffs' quasi-contract claims is Defendant's obligation to pay for its telecommunication services.  This obligation is directly governed by the Term Agreement, (D's Mem. at 6; *see* ECF No. 49-5), and specifically paragraph 5, which obligates Defendant to pay for services used fraudulently or without authorization, (*see* ECF No. 49-5 ¶ 5).  Tellingly, Plaintiffs repeatedly direct the Court to the Term Agreement, noting that Defendant "has contractually bound itself to pay for the telecommunication services notwithstanding the fact the charges were derived from fraudulent use which [Defendant] has not disputed," (Ps' Mem. at 6, 8), and Defendant's failure to pay for contracted-for services is inequitable and unjust, (*id.* at 6).  And in the AC, Plaintiff makes clear that both claims are predicated on Defendant's breach of the Term Agreement.  (AC ¶ 31 ("Notwithstanding the fact Ashley has received the telecommunication services, Ashley has failed and refused to make payment for those services pursuant to the Agreement to either BCN, Fusion or the Plaintiffs."); *id.* ¶ 37 ("Ashley has received the benefit of receipt of the telecommunication services at the expense of Plaintiffs, and Plaintiffs have paid the sums due for that service pursuant to the Agreement and Guaranty.").)  Given that the Term Agreement governs Defendant's obligation to pay for the telecommunication services at issue, Plaintiffs quasi-contract claims are precluded despite the fact that Plaintiffs were not a party to the Term Agreement.  *See Viable Mktg. Corp.*, 2011 WL 3841417, at *3; *Tchrs. Ins. & Annuity Ass'n of Am*, 681 F. Supp. 2d at 512; *see also Mueller v. Michael Janssen Gallery Pte. Ltd.*, 225 F. Supp.

3d 201, 208 (S.D.N.Y. 2016) ("Applying the rule here, Mueller's unjust enrichment claim is barred by the Agreement's existence even though Newman was not a signatory to that Agreement."); *Ellington Credit Fund*, 837 F. Supp. 2d at 203 ("Although the SPS Affiliates were not parties to the PSA, they were allegedly enriched as a result of SPS's noncompliance with the PSA's servicing standards.  This claim thus falls squarely within the subject matter of the PSA."); *Granite Partners, L.P. v. Bear, Stearns & Co., Inc.,* 17 F. Supp. 2d 275, 311 (S.D.N.Y. 1998) ("Unjust enrichment is a quasi-contractual remedy, so that such a claim is ordinarily unavailable when a valid and enforceable written contract governing the same subject matter exists.  This is true whether the contract is one between parties to the lawsuit, or where one party to the lawsuit is not a party to the contract.").

Plaintiffs argue in opposition that their quasi-contract claims are not precluded because "the Term Agreement itself is not in dispute."  (Ps' Mem. at 5; Ps' Reply at 3).  But the case law on preclusion does not require the contract to be in dispute – it requires that the contract govern the subject matter at issue.  Plaintiffs have not cited any authority to the contrary.  Accordingly, the relevant question is whether the Term Agreement covers the same subject matter giving rise to Plaintiffs' unjust enrichment and quantum meruit claims – and I have already found that it does – not whether Defendant disputes its obligation under the Term Agreement.[7]

Although I find that Plaintiffs' quasi-contract claims are precluded, I will nevertheless consider the merits out of an abundance of caution.  Defendant argues that Plaintiffs have failed to allege the elements of unjust enrichment.  (D's Mem. at 7-8.)  Defendant argues that (1) it

---

[7] Plaintiffs also contend that the instant dispute is not about whether Defendant owes the money, but about whether Plaintiffs can collect it, given that Fusion has withheld a corresponding amount from Plaintiff.  (Ps' Reply at 3.)  That is not a fair description of the controversy between Plaintiffs and Ashley, but even if it were, that issue would be governed by the Guaranty.

received no benefit because it did not use the hacked services, (2) the provision of services was not at Plaintiffs' expense because the services were provided by Verizon and BCN, and (3) "there is nothing equitable about Ashley bearing the costs of its hacked phone lines." (*Id.*)  In opposition, Plaintiffs argue that (1) the benefit Defendant received was continuing to receive telecommunication services from Fusion without having to pay its outstanding balance,[8] (2) this benefit was at Plaintiffs' expense because money was withheld from Plaintiffs as a result of Defendant's failure to pay, and (3) equity requires Defendant to compensate Plaintiffs because the Term Agreement requires payment for fraudulent charges and BCN and Fusion have already been "paid" through the BCN APA and the Guaranty.  (Ps' Mem. at 5-6.)

While Defendant may have received a "benefit" in being able to use Fusion's telecommunication services without paying its arrearage, and assuming that Fusion continued to service Defendant because it had been paid under the Guaranty,[9] "the mere fact that the

---

[8] This theory differs from the theory put forth in the AC.  There Plaintiffs alleged that Defendant received the benefit of the fraudulent services without paying for them.  Here Plaintiffs allege that the benefit Defendant received is the ability to receive additional services without paying off the debt from the fraudulent services.  The law is clear that a party may not introduce a new theory in opposition to a motion for summary judgment.  *See, e.g.*, *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) (affirming district court's refusal to consider new theory of bad faith raised for first time in opposition to insurer's summary judgment motion); *Saray Dokum ve Madeni Aksam Sanayi Turizm A.S. v. MTS Logistics, Inc.*, No. 17-CV-7495, 2021 WL 1199470, at *7 (S.D.N.Y. Mar. 30, 2021) (collecting cases); *Prescott v. Nationwide Mut. Ins. Co.*, No. 17-CV-6508, 2020 WL 64185, at *2 n.3 (E.D.N.Y. Jan. 7, 2020) ("It is settled law in this Circuit that it is inappropriate to raise new factual allegations or legal theories for the first time in submissions in opposition to summary judgment.").  Plaintiffs may have tried to change course in recognition of the fact that the theory properly before the Court in the AC– that Defendant received the benefit of the services without paying for them – is plainly not viable, as Defendant did not receive the services the hackers stole.  I nevertheless consider Plaintiffs' new theory in an excess of caution.

[9] Plaintiffs have not made clear that this "benefit" is even related to Plaintiffs and the Guaranty.  In his deposition, Soldan described Fusion's collection practices,

plaintiff's activities bestowed a benefit on the defendant is insufficient to establish a cause of action for unjust enrichment; rather, it is also the plaintiff's burden to demonstrate that services were performed *for the defendant* resulting in the latter's unjust enrichment." *Costa v. Deutsche Bank Nat'l Tr. Co. for GSR Mortg. Loan Tr. 2006-OA1*, 247 F. Supp. 3d 329, 354 (S.D.N.Y. 2017) (emphasis in original). "For a quasi-contract claim, it is not enough that the defendant received a benefit from the activities of the plaintiff; if services were performed at the behest of someone other than the defendant, the plaintiff must look to that person for recovery." *Abeles, Inc. v. Creekstone Farms Premium Beef, LLC*, No. 06-CV-3893, 2010 WL 446042, at \*10 (E.D.N.Y. Feb. 1, 2010). According to Plaintiffs, Fusion has withheld $122,802 from Plaintiffs pursuant to the Guaranty as a result of Defendant's refusal to pay its outstanding balance.[10] Assuming that the money was withheld from Plaintiffs due to Defendant's failure to pay and not for another reason, this "benefit" was given by Plaintiffs *to Fusion* as a result of the Guaranty. And the Guaranty does not extinguish Defendant's obligation to pay its outstanding balance. According to both parties, Fusion continues to maintain Defendant's account receivable on its

---

> If the customer does not pay outside of any other factors in this particular case, we see there is a balance that's in dispute and all of the other payments are being made in a timely fashion, until that dispute is rectified, we will continue to allow that customer to operate and pay their bills as they do in normal course.

(Soldan Depo. at 91:13-21.) Plaintiffs have not shown whether Fusion allowed Defendant to continue to use services while carrying an outstanding balance because Fusion collected from Plaintiffs under the Guaranty. But for purposes of the instant motions, I will assume that that is the case.

[10] There appears to be an issue of fact as to whether the $122,802 was withheld because of Defendant's account receivable or a separate dispute over commissions between McCrosson and Fusion. (D's 56.1 Resp. ¶ 16; ECF No. 49-20 ("McCrosson Depo. 2") at 156:7-157:4 (testifying that Fusion reduced his commission by $122,802 because Defendant's account receivable remained unpaid); Soldan Depo. at 59:4-19 (testifying that he did not know which bad debt items influenced the holdbacks on McCrosson's commission).) For purposes of the instant motions, I will assume Plaintiffs are correct.

16

books.  (D's 56.1 Stmt. ¶ 21; Ps' 56.1 Stmt. ¶ 21.)  As such, Plaintiffs have not satisfied

Defendant's debt nor has Defendant's obligation to pay been extinguished.  Instead, Fusion has

withheld funds from Plaintiffs, pursuant to paragraph 7 of the Guaranty, and will reimburse

Plaintiffs should it receive payment from Defendant.  In other words, contrary to Plaintiffs'

argument that it may collect from Defendant because it satisfied Defendant's debt to Fusion, (Ps'

Mem. at 6; Ps' Reply), Plaintiffs merely satisfied *their own* obligation to Fusion.

The mismatch inherent in Plaintiffs' theory is illustrated by two contradictions.  First,

Plaintiffs in the AC seek $126,372.88, which is what Defendant allegedly failed to pay, but

under the Guaranty they would be entitled only to the $122,802 allegedly withheld from

McCrosson's commission.  Second, while Plaintiffs allege under their new theory that the benefit

to Defendant is the value of using telecommunication services without having to settle an

outstanding balance, they have provided no reason to believe that that value is equivalent to the

amount of the outstanding balance, which has not been taken off of Fusion's books and which

Defendant is still obligated to pay.

Accordingly, Plaintiffs' claims of unjust enrichment and quantum meruit must fail.

## C.      Equitable Subrogation

Both parties move for summary judgment on Plaintiffs' equitable subrogation claim.  In

the AC, Plaintiffs allege that they were required to advance to Fusion the amount that Defendant

owed pursuant to the Term Agreement and accordingly, they are entitled to be subrogated to the

rights of Fusion and collect Defendant's account receivable payment.  (AC ¶¶ 43-44.)

"Rooted in equity, the purpose of the subrogation doctrine is to afford a person who pays

a debt that is owed primarily by someone else every opportunity to be reimbursed in full."

*Chem. Bank v. Meltzer*, 93 N.Y.2d 296, 304 (1999).  The doctrine of equitable subrogation

> is broad enough to include every instance in which one party pays a debt for
> which another is primarily answerable and which in equity and good conscience
> should have been discharged by the latter, so long as the payment was made either
> under compulsion or for the protection of some interest of the party making the
> payment, and in discharge of an existing liability.

*Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of N.Y.*, 735 F. Supp. 2d 42, 90 (S.D.N.Y.

2010).

> A party seeking subrogation can establish that its payments were not voluntary either by
> pointing to a contractual obligation or to the need to protect its own legal or economic
> interests.  When invoking the latter ground, however, the party seeking subrogation must
> show that the act is not merely helpful but necessary to the protection of its interests.

*Broadway Houston Mack Dev., LLC v. Kohl*, 897 N.Y.S.2d 505, 506 (App Div. 2010).

Defendant argues that Plaintiffs are unable to recover under their equitable subrogation

claim for the following reasons:  (1) the Guaranty does not provide Plaintiffs any rights against

Defendant; (2) even if it did, the Guaranty was rejected in Fusion's bankruptcy; (3) Plaintiffs did

not discharge any obligation of Defendant to Fusion; (4) a party may not proceed by way of

equitable subrogation against a third party whose liability exists by way of contract; and (5)

Plaintiffs voluntarily chose to guarantee Defendant's debt.  (D's Mem. at 12.)  Plaintiffs, in

opposition, argue that (1) the Guaranty permits Plaintiffs to "pursue Ashley for the unpaid

receivable"; (2) the Guaranty was not rejected in bankruptcy; (3) "the fact that the receivable

remains due and owing support [*sic*] Plaintiffs' right to collect the receivable as the Guaranty

specifically gives Plaintiffs the right to be subrogated to that of Fusion"; and (4) Plaintiffs did not

voluntarily enter into the Guaranty but were required to by Fusion and BCN as a condition of

Fusion and BCN entering into the BCN APA.  (Ps' Mem. at 8-12.)

I need not address most of these contentions, because the equitable subrogation claim

founders on the same issue as the quasi-contract claims:  Plaintiffs did not pay the debt for which

Defendant is answerable; it paid the debt for which they were answerable under the Guaranty.

18

As noted above, Plaintiffs' allegations are inconsistent:  they claim in the AC to be entitled to

Defendant's outstanding balance of $126,372.88, (AC ¶ 46), even though Fusion withheld only

$122,802 from Plaintiffs' commissions, (McCrosson Depo. 2 at 156:7-157:4; *see* D's 56.1 Resp.

¶ 16), and Defendant's receivable remains on Fusion's books, (Ps' 56.1 Stmt. ¶ 21).  Even

assuming Fusion withheld from Plaintiffs the full outstanding balance, and assuming that the

money withheld was a result of Defendant's failure to pay its account receivable and not for

another reason, Plaintiffs have simply not discharged Defendant's debt.  According to both

parties, Defendant is still obligated to pay Fusion for the full amount of its outstanding balance.

Further, paragraph 4 of the Guaranty waives Plaintiffs' right of "subrogation . . . or any

similar right the [Plaintiffs] may have against any Person."  (ECF No. 49-11 ¶ 4(a).)  Plaintiffs

have not responded to Defendant's argument in this regard or otherwise explained how they are

not asserting a right of subrogation against Defendant in this case.

Plaintiffs contend that the Guaranty provides "Plaintiffs with the right to step into

Fusion's shoes and pursue collection of the Ashley receivable on behalf of Fusion."  (Ps' Mem.

at 9.)  There are two problems with this argument.  First, paragraph 5 of the Guaranty indeed

provides that Plaintiffs may take all lawful measures to collect receivables "for Fusion," (ECF

No. 49-11 ¶ 5), but there is no provision assigning a debt to Plaintiffs if Plaintiffs make a

payment under the Guaranty.  The arrangement merely permits Plaintiffs to perform collection

services, as it had done for its customers prior to the assignment of the accounts from BCN to

Fusion.  (*See* D's 56.1 Stmt. ¶ 3; McCrosson Depo. 1 at 65:3-6; Kean Depo. at 20:3-13.)  It does

not permit Plaintiffs to attempt to collect on its own behalf.  Second, if Plaintiffs in this lawsuit

were in fact stepping into Fusion's shoes, the claim would be for breach of contract, as

19

Defendant's obligation to Fusion arose under the Term Agreement; the claims would not be quasi-contract or equitable claims.

Plaintiffs simply did not bargain for an agreement that would allow it to bring Fusion's breach of contract claim against Defendant in these circumstances.  But Fusion did, in the Guaranty, undertake to use its best efforts to assist Plaintiffs in collection efforts, as long as the TOG APA had not been terminated and as long as the Guaranty was enforceable.  If Plaintiffs' inability to collect from Defendant on Fusion's behalf (and thereby receive reimbursement from Fusion for what Fusion withheld from Plaintiffs' commissions) was due to a failure of assistance on Fusion's part, and if the two contracts are still in effect, and if there were no release or other barrier, Plaintiffs' remedy would be against Fusion.

Accordingly, Plaintiffs' claim against Defendant for equitable subrogation must fail.

IV.     **CONCLUSION**

For the foregoing reasons, Defendant's motion is GRANTED, and Plaintiffs' cross-motion is DENIED.  The Clerk of Court is respectfully directed to terminate the pending motions, (ECF Nos. 47, 52), enter judgment for Defendants, and close the case.

**SO ORDERED.**

Dated: March 7, 2023
       White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.